31 C.C.P.A. (Patents)

### In re TSCHOP.
### Patent Appeal No. 4818.

Court of Customs and Patent Appeals.

Dec. 7, 1943.

516

Anthony William Deller, of New York City, for appellant.

W. W. Cochran, of Washington, D. C. (E. L. Reynolds, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming (except on a question of new matter) the decision of the examiner rejecting four claims, numbered 57 to 60, inclusive, of appellant's application for patent bearing the broad title, "For Nickel Anodes." All the claims are for the product.

Claim No. 57 reads as follows: "57. As a new article of manufacture, a nickel anode, said anode being of unfused electrodeposited nickel throughout the cross-section thereof, being at least 0.25 inches thick, having a grain size greater than the wave length of light, being substantially devoid of carbon and containing about 0.01% to about 0.25% sulfur and the balance nickel including small amounts of cobalt and incidental impurities not subversive of the corroding characteristics of said anode, said electrolytic nickel anode corroding uniformly and smoothly, being active up to about pH 5.5 and producing only a small amount of sludge and loose nickel when corroded as an anode in conventional nickel electroplating baths."

The other claims are similar, except that they embrace limitations respecting quantities of some ingredients not specified in claim No. 57.

Claim No. 58 recites a sulfur content of "about 0.045%" and a copper content of "about 0.01%." Claim No. 59 recites a sulfur content of "about 0.071%," a copper content of "about 0.040%," a lead content of "about 0.04%," and an iron content of "less than about 0.05%." Claim No. 60 recites a sulfur content of "about 0.05%," a copper content of "about 0.04%," an iron content of "less than about 0.05%," a zinc content of "about 3.13%,"and a lead content of "about 2.015%."

We think it will be conducive to clearness relative to subsequent parts of this opinion to state at this point that the only ingredient of appellant's anode which is claimed to be critical is the *sulfur* element and that the criticalness claimed for it, apparently, is not based so much upon any particular *percentage* of it named in any one of the claims as it is upon the *element per se*.

Each of the claims describes the nickel anode as "being substantially devoid of

carbon," and one ground upon which the examiner based rejection of them was that this phrase constituted new matter because it does not appear in the specification. The board, for reasons stated by it, held that the phrase does not constitute new matter, thus reversing that phase of the examiner's decision, but added: "However, the phrase is purely negative and can be given no patentable weight. In our opinion it is immaterial whether this phrase remains in the claims or not."

The other ground of rejection by the examiner was lack of invention over prior art cited and that ground was sustained by the board, the references relied on being: Geiger 1,941,257 December 26, 1933; Waite 2,112,818 March 29, 1938; "The Metal Industry," published in London, January 22, 1937, pages 141 to 144, incl.

The field in which appellant's alleged invention lies is highly technical and difficult of satisfactory description to persons not skilled in the art of what is designated as "electro-deposition." In the introductory part of its brief appellant has favored the court with a general statement respecting the art which we have found informative and interesting, but the actual issues which we are called upon to determine seem to us to be comparatively simple, and no detailed discussion of the art is required.

■ All the claims before us are product claims—that is, they are for an anode composed of certain ingredients. They do not describe the product by the process of manufacture and, hence, the method of production is not involved.

It is clear that the prior art cited discloses nickel anodes containing a sulfur ingredient, the percentage of sulfur being substantially within the percentage range defined in appellant's claims.

The examiner pointed out that all the elements of claim No. 57 are disclosed in the Geiger patent, the claims of which are method claims, with the single exception that while Geiger melts or fuses his electrodeposited nickel to add sulfur thereto, appellant does not melt, his being (as described in each of his claims) an anode "of unfused electrodeposited nickel throughout the cross-section thereof."

The examiner made an analytical statement respecting claim No. 57 and the disclosures in the Geiger patent, which we take the liberty of reproducing here:

Claim 57 may be taken as typical. It reads in full:

"(a) 57. As a new article of manufacture, a nickel anode,

"(b) said anode being of unfused electrodeposited nickel throughout the cross-section thereof,

"(c) being at least 0.25 inches thick,

"(d) having a grain size greater than the wave length of light,

"(e) being substantially devoid of carbon

"(f) and containing about 0.01% to about 0.25% sulfur and and the balance nickel including small amounts of cobalt and incidental impurities not subversive of the corroding characteristics of said anode,

"(g) said electrolytic nickel anode corroding uniformly and smoothly, being active up to about pH 5.5 and producing only a small amount of sludge and loose nickel when corroded as an anode in conventional nickel electroplating baths.

"This claim stands rejected as failing to define inventively over Geiger. It is clear that limitations a, c, d, e, f, and g, are each present in Geiger, as follows:

"(a) Page 1, line 3, 'nickel anodes.'

"(c) Page 1, lines 16, 17, since cast or rolled anodes are conventionally at least ¼ inch thick.

"(d) Since light has a wavelength of approximately 0.00001 inches, the grain size of the reference must exceed this value.

"(e) Page 1, lines 41 to 47.

"(f) Page 2, lines 98, 99.

"(g) Page 1, lines 89 to 97.

"Limitation b reads on Geiger, except for the single word 'unfused'."

It was the view of the examiner that the difference between the fused and unfused anodes did not lend patentability to the claims. He said: "This distinction is not of patentable weight, since it states what applicant does not do rather than what he does. The claim fails to define a single characteristic or property of the anode, that is not true of the reference. If there is any novel *anode* produced by the mere omission of Geiger's fusion step, this claim fails to point out such novelty. Applicant's article is produced by a different process from that of Geiger, but the article (as recited) is identical with the patentee's." (Italics quoted.)

In his discussion of the other claims the examiner pointed out that the sulfur content named in them is within the range designated in claim No. 57.

"The Metal Industry" publication, apparently, was principally relied upon for the disclosure of a nickel anode containing various ingredients such as copper, iron, manganese, etc. It also discloses a small percentage of sulfur.

Certain physical exhibits of types of anodes were presented before the board and before us. Discussing these, the board said: "It must be admitted that there is quite a noticeable difference between the physical characteristics of electrodeposited and cast or rolled nickel, but these differences are well known in this art. The publication shows that pure nickel used in industry is usually supplied in the form of electrodeposited plates or sheets of about one quarter inch in thickness. These plates are cut up into pieces of suitable size. This publication also states that unmodified electrodeposited nickel is not suitable for use as an anode and this is substantiated by the affidavits of record."

We feel constrained to agree with the tribunals of the Patent Office that appellant has failed to demonstrate anything patentable over Geiger, so far as the product is concerned. The product resulting from Geiger's process obviously must contain substantially the same elements or ingredients as those defined in the claims here in issue.

It may be that the anode which appellant claims is superior to that of Geiger by reason of the sulfur being introduced without the metal being melted or fused, but that is not regarded as a patentable distinction with respect to the product.

Furthermore, notwithstanding appellant's contentions respecting the Waite patent, we fail to see wherein it is not a pertinent reference.

Of this patent, the board said: "[It] relates to the electroplating of metal with nickel so as to form a comparatively thin and bright coating. In order to obtain this result, a small amount of naphtalene sulfonic acid is added to the bath. An analysis of the nickel deposit as given in lines 1–5, column 2, page 5, shows that it contains .04% of sulphur. This clearly comes within the range given in the appealed claims."

Elsewhere, the board said: "The Waite patent shows that there was no difficulty involved in incorporating sulfur in the electrodeposited nickel."

It is insisted in the brief for appellant that of the seven examples of bath compositions given by Waite from which bright nickel may be electroplated only one of them teaches that bright nickel electroplates can be obtained with a "mixture of the elements carbon, sulfur and cadmium or zinc (italics quoted)," and the following is quoted from the Waite specification: "The deposits obtained when using cadmium or zinc in conjunction with a sulfonic addition agent or "catalyst" as in Example 7 hereinabove, are found upon analysis to contain carbon and sulfur together with either cadmium or zinc as the case may be." (Italics quoted from brief.)

The fact that only one out of the seven examples specified a sulfur content does not seem to us to affect the validity of the patent as a reference. One may teach as much as many.

It is contended, in effect, that the statement of the board that the Waite patent shows there was no difficulty involved in incorporating sulfur in the electrodeposited nickel is not justified. The statement obviously was a conclusion of the board based upon its study of the patent. From our own study of the patent, in the light of appellant's argument concerning it, we can discern no reason for questioning the board's conclusion in that regard.

Appellant's most serious argument on this phase of the case seems to be predicated upon the fact that Waite names carbon as an element, whereas appellant's claims recited an anode "substantially free of carbon." This, we think, has been sufficiently discussed above, and we agree with the board's holding on that phase of the case.

During the prosecution of the case in the Patent Office certain affidavits and documentary exhibits were introduced by appellant. These were discussed in some detail in the statement of the examiner following the appeal to the board, and, as appears from its decision, were duly considered by the board.

We have examined them in the light of appellant's elaborate discussion of them in his brief and during oral argument. We fail to find in them any convincing evidence that the concurring decisions of

the tribunals of the Patent Office rejecting the claims as presenting nothing patentable over the prior art cited were erroneous.

The decision of the board is affirmed.

Affirmed.